775 P.2d 1113

**WALTER E. HELLER WESTERN, INC., a California corporation, Plaintiff–Appellant,**

**v.**

**ARIZONA DEPARTMENT OF REVENUE, Defendant–Appellee.**

**No. CV–86–0485–PR.**

Supreme Court of Arizona, En Banc.

Jan. 17, 1989.

Robert K. Corbin, Atty. Gen. by Gail H. Boyd, Asst. Atty. Gen., Phoenix, for defendant-appellee.

Gust, Rosenfeld & Henderson by Richard A. Segal, DeAnn Willis, Dushoff & McCall by Dale S. Zeitlin, Phoenix, for plaintiff-appellant.

HOLOHAN, Justice (Retired).

The trial court granted a summary judgment for the Arizona Department of Revenue ("Department") in an action brought by Walter E. Heller Western, Inc. ("Heller Western") challenging the Department's assessment of its income tax liability for the years 1976, 1977, 1978, and 1979. The Court of Appeals reversed, and the Department petitioned this court for review. The dispute between the Department and Heller Western, a multistate commercial financing business, concerns the correct computation of the sales factor ratio in a three-factor formula apportioning a share of Heller Western's multistate income to Arizona for tax purposes. The issue is whether the borrowing of money by Heller Western through its Los Angeles headquarters to make loans to customers in Arizona is "income producing activity."

## FACTS

Heller Western is a California corporation qualified to do business in Arizona. The corporation's commercial domicile and headquarters are located in Los Angeles, California, and it has branch offices in six states, including Arizona. Heller Western is a subsidiary of Walter E. Heller & Company ("Heller & Company"), a Delaware corporation commercially domiciled in Illinois.

Heller Western is engaged in commercial financing and lends money to commercial borrowers. The corporation provides financing to corporate and other customers for accounts receivable, inventory, equipment, fixed assets, and leasing. Heller Western's Arizona branch solicits new customers in Arizona, examines books and records of potential Arizona customers to determine credit worthiness, negotiates Arizona contracts, and services existing contracts. On loans of over one million dollars negotiated by the Arizona branch, employees at Heller Western's California headquarters and at Heller & Company in Chicago approve credit and make the decision whether to enter into the loan contract. The Los Angeles office monitors the progress of loans made in Arizona.

Funds for lending are not generated by Heller Western. Heller & Company does the actual borrowing of funds to finance the loans to Heller Western's customers, primarily through the issuance of commercial paper. Heller & Company borrows for other entities within the Heller system as well; funds are not earmarked for a particular branch or customer. Heller Western's Los Angeles headquarters pays its parent corporation, Heller & Company, for the interest expense associated with the borrowing.

After auditing Heller Western's records for the years 1976 through 1979, the Department levied certain tax deficiencies against Heller Western, together with interest and penalties. The only issue not resolved by the audit is whether interest income earned by Heller Western on loans to Arizona customers should be included in the numerator of the sales factor, which is used in determining Heller Western's Arizona taxable income. Prior to 1978, Heller Western included interest received from loans to Arizona customers in the numerator of the sales factor. In 1978 and thereafter, Heller Western reported no interest income received from loans to Arizona customers in the numerator of the sales factor, claiming that its previous inclusion of the income was erroneous.

Heller Western received interest and commission income from all of its multistate unitary operations in the amount of $28,021,968 in 1978 and $42,503,738 in 1979. Of Heller Western's 1978 interest and commission income, $4,375,000 (15.6%) was derived from Arizona contracts. Of its 1979 interest and commission income, $6,665,000 (15.7%) was derived from Arizona contracts.

## ANALYSIS

Former statute A.R.S. § 43–1141(A)

(1979),[1] repealed effective January 1, 1984, provided that if income from a corporation "is derived from or attributable to sources both within and without the state," the tax is to be measured only by income "derived from or attributable to sources within this state." Subsection (B) stated that income attributable to sources within Arizona is to be determined by either a separate accounting or on an apportionment basis. A.R.S. § 43–1141(B), repealed effective January 1, 1984. Unitary businesses, where the operation of the portion of business within Arizona depends on or contributes to the business outside of Arizona, must use the apportionment method to compute the amount of total income subject to Arizona tax. *See* Ariz.Comp.Admin.R. & Regs. ("A.C.A.R.R.") R15–2–135–8(a) (1978).[2] Heller Western is a unitary corporation, and accordingly reports its income to Arizona on an apportionment basis. *See generally Superior Oil Co. v. Franchise Tax Board*, 60 Cal.2d 406, 34 Cal.Rptr. 545, 386 P.2d 33 (1963) (discussion of unitary businesses and apportionment basis taxation).

A three-factor formula is used to apportion income to Arizona. A.C.A.R.R. R15–2–135–8(b)(2) (1978). The formula provides that the income to be apportioned to Arizona is determined by applying the apportionment percentage which is the arithmetical average of the following three ratios:

1. Ratio of tangible property in Arizona to tangible property everywhere;

2. Ratio of payroll in Arizona to payroll everywhere;

3. Ratio of sales in Arizona to total sales within and without Arizona.

In this case, we are concerned only with the sales factor of this equation. "Sales" is defined to include "all gross receipts from transactions and activities in the course of the regular trade or business operations that produce income." A.C.A. R.R. R15–2–135–8(b)(5)(a) (1978). Arizona's regulation also provides that:

[s]ales other than sales of tangible personal property are in this State if:

(i) The income producing activity is performed in this State.

(ii) The income producing activity is performed both in and outside this State and a greater proportion of the income producing activity is performed in this State than in any other state based on the *costs of performance.*

A.C.A.R.R. R15–2–135–8(b)(5)(j) (1978) (emphasis added).

Both parties cite Multistate Tax Commission ("MTC") Apportionment Regulation IV.17[3] as authority for interpreting Arizona's regulation. The Multistate Tax Commission was established in 1969 in response to the possibility of federal legislation. Its duties include the establishment of uniform income tax regulations. State Tax Guide (CCH) § 347 at 354. However, the Arizona Department of Revenue has only recently adopted its definition of income producing activity. *See* A.C.A.R.R. R15–2–1147(1) (1986). Regulation IV–17,

---

1. The statute in effect before 1979, A.R.S. § 43–135, contains essentially the same provisions.

2. The A.C.A.R.R. was revised in the 1980's under the title of the Arizona Administrative Code.

3. The definition of "income producing activity" in the MTC Apportionment Regulations is as follows:

(2) Income Producing Activity: Defined. The term "income producing activity" applies to each separate item of income and means the transactions and activity directly engaged in by the taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit. Such activity does not include transactions and activities performed on behalf of a taxpayer, such as those conducted on its behalf by an independent

contractor. Accordingly, income producing activity includes but is not limited to the following:

(A) The rendering of personal services by employees or the utilization of tangible and intangible property by the taxpayer in performing a service.

(B) The sale, rental, leasing, licensing or other use of real property.

(C) The rental, leasing, licensing or other use of tangible personal property.

(D) The sale, licensing or other use of intangible personal property.

The mere holding of intangible personal property is not, of itself, an income producing activity.

State Tax Guide (CCH) § 352 at 383 (1980).

therefore, was not the law in Arizona at the time period in question in this case.

Heller Western argues that a commercial lender's interest expense is a direct cost of its lending business. The corporation maintains that the activities of its California office in borrowing money from the parent company in Illinois are as essential to the process of generating revenue from Arizona loans as "customer contact" activities in Arizona. Thus, the borrowing and expense associated with it was an "income producing activity" occurring outside of Arizona that constituted more than fifty percent of the cost of performing the loan. The Department contends that only the activities of the Arizona branch office immediately resulted in generating income from the Arizona loans. Thus, only those activities qualify as "income producing activity" within the meaning of Regulation IV.17(2).

The Court of Appeals found that all of the activities engaged in by the Heller system—from borrowing of funds to negotiating contracts—constituted income producing activity. But it did not base its decision on Regulation IV–17. Rather, it ruled that a commercial lender's interest expenditures are direct costs of its business and, based upon the Department's 1978 regulation, therefore constitute income producing activity. *See* A.C.A.R.R. R15–2–135–8(b)(5)(j)(ii) (1978).

■ We do not find Regulation IV–17, adopted in Arizona in 1986, dispositive of the tax regulations of 1978. Nor do the few cases cited by the parties aid us in deciding whether Heller Western's borrowing of money from Heller & Company constitutes the income producing activity necessary to show that a sale "other than the sale of tangible personal property" occurred in Arizona. However, we disagree with the reasoning and conclusion of the Court of Appeals. We believe that the term, "income producing activity," in our regulation contemplates only direct sales payment activity by the consumer, which in this case occurred in Arizona.

The 1978 amendment of the sales subsection of the Department's apportionment regulation, A.C.A.R.R. R15–2–135–8(b)(5) (1978), greatly expanded its predecessor. The 1975 sales subsection provided only that "Arizona sales include sales originating from sales activities within the State whether or not the sale actually is consummated in Arizona." Thus, the sales allocation was governed by where the selling activities, *i.e.*, the interaction between the buyer and seller leading to the sale, took place. Those activities involve soliciting and entering into the business transaction rather than consummating it. For example, "Promotional activities of an employee also are given weight as a sales factor." A.C.A.R.R. R15–2–135–8(b)(5) (1975).

Further, those activities are uniformly local to the situs of the *consumer*. This conclusion is evident from the comments following the definition quoted above. For example, payments for interstate transportation of freight are allocated to the state where the freight is delivered, not purchased, because that is where the consumer is. However, payments for interstate transportation of people on a common carrier are allocated to the state where the ticket is purchased, not the traveler's destination, again because that is where the consumer is. Finally, payments resulting from business generated by interstate telephone calls are allocated to the state where the customer placed or received the call; whether the seller called the consumer or the consumer called the seller, it is the consumer's situs that is determinative.

In 1978, that subsection of the regulation was amended, expanding the 1975 regulation with a quantity of detail. However, the general focus on location of the consumer was preserved. For instance, just as the interstate freight transportation had been allocated to the delivery point in the 1975 regulation, interstate sales of tangibles were allocated to the point of delivery to the purchaser, in the 1978 regulation. *See* A.C.A.R.R. R15–2–135–8(b)(5)(b) (1978). Similarly, ticket sales for interstate transportation of people were governed by the place of purchase, and sales generated by telephone calls were allocated to the state of the customer—just as in the 1975 regulation. *See* A.C.A.R.R. R15–2–135–

8(b)(5)(j)(iii) (1978). Although the balance of subsection (j), the interpretation of which is in dispute here, failed to clarify whether its "income producing activity" must also be deemed consumer-local, that conclusion would be clearly consistent with the pattern of consumer payment orientation of the whole regulation. Therefore, in accordance with the consumer location orientation of the 1975 regulation, as followed in the 1978 regulation, we hold that "income producing activity" contemplates direct solicitation, negotiation, and sales activities with consumers in this state.

This activity includes the solicitation of new customers, the investigation of potential customers' credit records, and the negotiation and servicing of these contracts in Arizona. Though borrowing of funds may be an important step in Heller Western's financing process, the direct generation of the loans occurred in Arizona. We conclude that Heller Western's sales activity in Arizona constituted the income producing activity contemplated by our tax regulations.

This is also the logical conclusion. Heller Western's costs in procuring the money (which is the "product" that it has "sold" to Arizona customers) are analogous to the costs of a merchandise retailer in procuring his inventory. Heller Western can no more argue that its receipts from Arizona loan consumers should not be taxed due to its out-of-state involvement in procuring its "inventory" than a retailer who is engaged in extensive dealings out of state to buy his merchandise could argue that he should not be taxed on the goods he sells to consumers here.

We therefore vacate the decision of the Court of Appeals and affirm the judgment of the superior court.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON, J., concur.

MOELLER, J., did not participate in the determination of this matter.