216 P.3d 1208

M.D.C. HOLDINGS, INC., a Delaware corporation; M.D.C. Land Corporation, a Colorado corporation; M.D.C. Holdings, Inc., as successor in interest to M.D.C. Development & Pipeline, Inc., formerly a Colorado corporation, formerly known as Richmond American Homes of Colorado, Inc., Richmond American Homes of California, Inc., a Colorado corporation; Richmond American Homes of Maryland, Inc., a Maryland corporation; M.D.C. Holdings, Inc., as successor in interest to 995 Corporation, formerly a Maryland corporation; M.D.C. Holdings, Inc., as successor in interest to Richmond American of Potomac Knolls, # 1, formerly a Maryland corporation; M.D.C. Holdings, Inc., as successor in interest to Richmond American of Potomac Knolls, # 2, formerly a Maryland corporation; M.D.C., Inc., as successor in interest to Richmond American of Potomac Knolls, # 3, formerly a Maryland corporation; M.D.C. Holdings, Inc., as successor in interest to Richmond American of Potomac Knolls, # 4, formerly a Maryland corporation; M.D.C. Holdings, Inc., as successor in interest to Richmond American of Potomac Knolls, # 5, formerly a Maryland corporation; M.D.C. Holdings, Inc., as successor in interest to Richmond American of Potomac Knolls, # 6, formerly a Maryland corporation; Richmond American Homes of Nevada, Inc., a Colorado corporation; Richmond American Homes of Virginia, Inc., a Virginia corporation, formerly known as The Yeonas Company; M.D.C. Holdings, Inc., as successor in interest to Greenway Farms Development Corp., formerly a Virginia corporation; Richmond American Homes, Inc., a Delaware corporation; Richmond American Construction, Inc., a Delaware corporation; Richmond American Homes of Arizona, Inc., a Delaware corporation; M.D.C. Holdings, Inc., as successor in interest to Richmond American Homes, Inc., formerly a Florida corporation; Rich-

mond Homes Limited, a Colorado corporation; HomeAmerican Mortgage Corp., a Colorado corporation; Lion Insurance Company, a Colorado corporation; Lion Warranty Corporation, a Colorado corporation; American Home Title & Escrow Company, a Colorado corporation; Enerwest, Inc., a Colorado corporation; MDC Residual Holdings, Inc., a Colorado corporation; Financial Asset Management, Inc., a Delaware corporation; MDC Financial Corporation, a Colorado corporation; M.D.C. Holdings, Inc., as successor in interest to M.D.C. Home Mortgage Finance Corporation, formerly a Colorado corporation; M.D.C. Acceptance Corporation, a Colorado corporation; M.D.C. Home Finance Corporation, a Colorado corporation; M.D.C. Home Finance Corporation, a Colorado corporation; M.D.C. Mortgage Finance, Inc., a Delaware corporation; M.D.C. Institutional Residuals, Inc., a Colorado corporation; M.D.C. Holding Inc., as successor in interest to M.D.C. Equities, Inc., formerly a Colorado corporation; M.D.C. Holdings, Inc., as successor in interest to ASFC–38, Inc., formerly a Colorado corporation; ASFC–W, Inc., an Arizona corporation; ASW Finance Company, an Arizona corporation; Yosemite Financial, Inc., a Colorado corporation; Yosemite American Mortgage Corporation, a Colorado corporation; M.D.C. Mortgage Funding Corporation II, a Delaware corporation; M.D.C. Holdings, Inc., as successor in interest to Designer Door & Millwork of California, Inc., formerly a Colorado corporation; M.D.C. Holdings Inc., as successor in interest to M.D.C. Construction CO., formerly a, Colorado corporation; M.D.C./Wood, Inc., a Delaware corporation; NNR/Stone Investment Co., formerly a Delaware corporation; M.D.C. Holdings, Inc., as successor in interest to Petro Resources, Inc., formerly a Delaware corporation; Richmond American Homes of Texas, Inc., a Colorado corporation; M.D.C., Holdings, Inc., as successor in interest to T.C.V., Inc., formerly a Colorado corporation; Richmond American Homes of Colorado, Inc., a Delaware corporation, formerly known as Richmond Homes, Inc. I; M.D.C. Holdings, Inc., as successor in interest to Van Schaack Referral Services; Richmond American Homes of Colorado, Inc., a Delaware corporation, formerly known as Richmond Homes, Inc. I; as successor in interest to Richmond Homes, Inc. II, formerly a Delaware corporation; M.D.C. Holdings, Inc., as successor in interest to Van Schaack & Company, formerly a Colorado corporation; Richmond Realty, Inc., a Colorado corporation; M.D.C. Holdings, Inc., as successor in interest to ECM Holdings, Inc., and Richmond Shelf, Inc., a Colorado corporation, Plaintiffs/Appellants,

v.

STATE of Arizona ex rel. ARIZONA DEPARTMENT OF REVENUE, Defendant/Appellee.

No. 1 CA–TX 070011.

Court of Appeals of Arizona, Division 1, Department T.

Oct. 6, 2009.

Steptoe & Johnson LLP by Patrick Derdenger, Bennett Evan Cooper, Dawn R. Gabel, Phoenix, Attorneys for Plaintiffs/Appellants.

Terry Goddard, Attorney General by Kimberly J. Cygan, Assistant Attorney General, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

IRVINE, Judge.

¶ 1 This case arises out of Arizona's Uniform Division of Income for Tax Purposes Act ("UDIPTA"), Arizona Revised Statutes ("A.R.S.") sections 43–1131 to –1150 (2006 & Supp.2008).[1] M.D.C. Holdings, Inc. ("MDC") claims that the Arizona Department of Revenue (the "Department") improperly calculated the sales factor fraction of its corporate income tax apportionment formula for the 1996 tax year. We hold that the denominator of the sales factor should include only the net gains from the sales of mortgages and mortgage servicing rights. We further hold that, under the facts of this case, the numerator of the Arizona sales factor should exclude those gains. Therefore, we affirm in part the judgment of the tax court, reverse it in part, and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 During 1996, MDC was the parent corporation of a group of corporations engaged in the construction, sale, and financing of housing. Its homebuilding component operated under the trade name of Richmond American Homes. It operated in several states, including Arizona, Nevada, California, Colorado, northern Virginia and suburban Maryland, and maintained its domicile and headquarters in Denver, Colorado.

¶ 3 Among MDC's subsidiaries was HomeAmerican Mortgage Company ("HomeAmerican"), which conducted MDC's mortgage lending operations. HomeAmerican's primary activities included: (1) mortgage loan origination; (2) servicing mortgage loans; and (3) secondary marketing of mortgage loans and bulk sales servicing. Loan officers operating in Arizona provided loan origination services for Arizona borrowers, the majority of whom were home-buying customers of Richmond American, and also engaged in investigation and limited negotiation of loan pricing terms. HomeAmerican's home office in Denver conducted all loan approval and administration tasks. HomeAmerican did not hold its mortgages until maturity, but instead transferred them to private investors within fifteen to forty-five days of origination. HomeAmerican then used the proceeds from such sales to originate new mortgages.

¶ 4 HomeAmerican's secondary marketing activities included accumulating mortgage loans and selling them in packages to secondary market investors such as Fannie Mae or Countrywide Home Loans. These bundled loans served as a foundation for mortgage-backed securities. MDC received interest on its loans while it held them. A committee meeting at HomeAmerican's offices in Denver approved sales of loans and servicing rights. Out of 1,200 MDC employees, approximately eleven performed servicing and secondary mortgage activities.

¶ 5 Mortgage servicing involves receiving payments from the borrower and remitting principal and interest to the mortgage loan investor, taxes to local taxing authorities, and insurance premiums to insurance companies. For this work, the servicer is paid a fee. MDC primarily obtained servicing rights related to mortgages it originated. Some of the servicing rights were sold along with the corresponding mortgage, but others were retained after the mortgage was sold and bundled together for separate sale at a later

---

1. We cite the current version of the applicable statute because no revisions material to this decision have since occurred.

time. The value of a portfolio of servicing rights was generally based on the annual servicing fee and the interest rates on the underlying loans. A portion of the cost of originating mortgage loans was allocated to the servicing rights, so any gain on a sale of servicing rights was calculated by subtracting the allocated cost from the sales price.

¶ 6 During the year at issue, MDC's financial statements separately accounted for its homebuilding, financial services and corporate components. Its homebuilding component showed an operating profit of $27,967,000, against total revenues of $890,536,000, including home and land sales. Financial services were divided between Mortgage Lending and Asset Management (not at issue here), and reflected an operating profit of $18,657,000. Within this amount, mortgage lending revenues included $3,543,000 of interest revenues, $6,209,000 of origination fees, $6,020,000 of gains on sales of mortgage servicing, $4,905,000 of gains on sale of mortgage loans (net), and $1,545,000 of mortgage servicing and other income.

¶ 7 MDC filed an Arizona corporate income return for the 1996 tax year on a unitary basis, including the income of HomeAmerican. *See State ex rel. Ariz. Dep't of Revenue v. Talley Indus. Inc.*, 182 Ariz. 17, 24–25, 893 P.2d 17, 24–25 (App.1994) (a business is unitary when there is a substantial interdependence of basic operations). On its tax returns, MDC and HomeAmerican reported the net income from the sale of mortgages and servicing rights, not the gross amounts received. For Arizona purposes, it included the same net amounts in the denominator of the sales factor, which is a fraction that compares the taxpayer's sales in the taxing state to its total sales everywhere. The portion of those amounts attributable to loans originated in Arizona was included in the numerator of the Arizona sales factor.

¶ 8 Several years after filing its original return, MDC filed an amended return seeking to change the amount of its multistate income apportioned to Arizona by including gross receipts from the sales of mortgage loans and servicing rights in the denominator of the sales factor. Consequently, instead of including in the denominator $4,905,000 of net gain on the sale of mortgages, MDC sought to include $574,047,000 of gross receipts. Similarly, instead of including $6,020,000 of net gain on sales of servicing rights, MDC sought to include $7,073,000 of gross receipts from the sale of those rights. Because MDC argued that the sales of mortgage loans and sales of mortgage loan servicing took place outside Arizona, the amended return removed any of MDC's revenues from those sources from the sales factor numerator. The end result was that the numerator went down and the denominator went up, reducing the Arizona sales factor from approximately 35% to approximately 22%. These changes reduced the taxable income attributable to Arizona, resulting in a refund request of $88,800 plus interest.[2]

¶ 9 After an administrative review process, the Department disallowed the changes. MDC appealed to the Arizona Board of Tax Appeals, which issued a decision in favor of the Department. The Board held that "[MDC] may not include in the denominator of its Arizona sales factor fraction the dollar value associated with the disposition of mortgages and servicing rights on the secondary mortgage market" and "[MDC] may not exclude from the numerator of its Arizona sales factor fraction all net gains recognized from the disposition of mortgages and servicing rights on the secondary mortgage market." MDC then filed an action in the Arizona Tax Court pursuant to A.R.S. § 42–1254(A) (2006).

¶ 10 The parties briefed and argued cross-motions for summary judgment on the proper components of the sales factor formula. The Department contended that only net receipts from the sale of mortgage loans and servicing rights could be included in the denominator because the sales represented treasury functions and included a return of

---

**2.** MDC sourced revenue from loan originations, the related interest income, and interim servicing fees to Arizona. Those revenue items are not at issue in this case.

principal. Alternatively, it claimed that even if gross receipts from sales of mortgages on the secondary market constituted a sale, they should be excluded from the denominator under A.R.S. § 43–1148 because they did not fairly represent the extent of MDC's business in Arizona. MDC, however, characterized these transactions as inventory sales that occurred in the regular course of its business as a securities dealer, rather than treasury functions. According to MDC, the sales were properly sourced to Colorado, not Arizona, because the marketing, bundling, and selling activities occurred in Colorado.

¶ 11 The tax court ruled in favor of the Department. Characterizing the mortgage loans as accounts receivable, the tax court excluded all sales of mortgage loans and servicing rights from the denominator. At the same time, the court determined that the net receipts from sales of loans secured by Arizona real property should be sourced to Arizona and included in the sales factor's numerator. It entered final judgment for the Department, and this appeal followed.

## DISCUSSION

### I. The Denominator of the Sales Factor Correctly Included Only the Net Proceeds from the Sales of Mortgage Loans and Mortgage Servicing Rights.

¶ 12 We review the tax court's grant of summary judgment de novo. *Wilderness World, Inc. v. Ariz. Dep't of Revenue*, 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995). Our task is to determine whether the tax court correctly applied the substantive law to the undisputed facts. *S. Pac. Transp. Co. v. Ariz. Dep't of Revenue*, 202 Ariz. 326, 329–30, ¶ 7, 44 P.3d 1006, 1009–10 (App.2002) (citing *Brink Elec. Constr. Co. v. Ariz. Dep't*

of Revenue, 184 Ariz. 354, 358, 909 P.2d 421, 425 (App.1995)). We review statutory interpretation questions de novo. *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 594, 826 P.2d 1217, 1220 (App.1991).

¶ 13 In interpreting statutes, we give effect to each pertinent portion. *State Bd. of Dispensing Opticians v. Schwab*, 93 Ariz. 328, 331, 380 P.2d 784, 787 (1963). Further, we give great weight to the Department's interpretation because it implements the statutes. *Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 73, ¶ 12, 97 P.3d 896, 898 (App.2004).

¶ 14 Arizona imposes a corporate income tax "upon the entire Arizona taxable income of every corporation." A.R.S. § 43–1111 (2006); *see* A.R.S. § 43–102(A)(5) (2006) (corporations are subject to Arizona tax on income earned from sources within the state). To enable taxpayers to allocate this income, the state adopted UDITPA, with certain variations, in 1983. A.R.S. §§ 43–1131 to –1150.[3] UDITPA authorizes the state to apportion the total income of a multi-jurisdictional taxpayer based upon fractions or "factors" that compare in-state and total sales, property, and payroll. Each of the three factors is itself a fraction, with numerators representing the value or amount of factor attributable only to Arizona and the denominator consisting of the value or amount of the factor everywhere (with certain omissions inapplicable here). A.R.S. §§ 43–1140 (property factor); 43–1143 (payroll factor); 43–1145 (sales factor); *see Walgreen*, 209 Ariz. at 72, ¶ 8, 97 P.3d at 897.

¶ 15 This appeal focuses on the sales factor. The sales factor is a fraction the numerator of which consists of the taxpayer's total sales in this state during the tax period, and the denominator of which is the taxpayer's

---

**3.** The National Conference of Commissioners on Uniform State Laws approved UDITPA in 1957. Its purpose was to establish a "uniform method of division of income among the several taxing jurisdictions" to "assure[ ] that a taxpayer is not taxed on more than its net income." Prefatory Note to UDITPA, U.L.A. Div. Inc. Tax. Ann. (2002).

Arizona omits the UDITPA definition for financial organizations as well as language in § 2 excluding financial organizations from the general allocation and apportionment provisions. A.R.S. §§ 43–1131; 43–1132. Consequently, financial institutions are subject to the same allocation and apportionment rules as other corporations. *See id.*

total sales everywhere. A.R.S. § 43–1145. For purposes of the statute, "sales" are "all gross receipts of the taxpayer not allocated under this title" except as "the context otherwise requires." A.R.S. § 43–1131(5).

¶ 16 MDC correctly points out that the sales factor includes receipts from the sale of intangible as well as tangible property, like the mortgage loans and servicing rights. The Arizona Administrative Code section R–15–2D–101 adds that "sales" means "all gross receipts derived by a taxpayer from transactions and activity in the regular course of a trade or business." Furthermore, "[i]n the case of a taxpayer engaged in the sale ... of intangible personal property such as patents and copyrights, 'sales' includes the gross receipts from these activities." A.A.C. § R15–2D–801(A)(5). Although this section does not specifically deal with loans, it also does not foreclose the application of gross receipts to other forms of intangible property.

¶ 17 HomeAmerican's sale of mortgage loans to secondary market investors occurs in HomeAmerican's regular trade or business and is a common practice in the mortgage industry. MDC agrees that its homebuilding, selling, and financing activities constitute a unitary business and HomeAmerican is "an integral part of the homebuilding operations."

¶ 18 Our analysis in this case is guided by our determination in *Walgreen* that applying UDITPA to financial instruments involving the return of investment principal may require including only the net proceeds in the sales factor. 209 Ariz. at 72–74, ¶¶ 2–17, 97 P.3d at 897–899. Walgreen Arizona Drug Company was in the business of operating retail drugstores. *Id.* at 72, ¶ 2, 97 P.3d at 897. Its parent company, Walgreen Company, a retail drug chain, earned interest on short-term instruments and typically reinvested the proceeds in similar interest-bear-

ing investments, such as commercial paper, municipal securities, auction stock, money markets, and Eurodollar investments. *Id.* at 72 n. 1, ¶¶ 3–4, 97 P.3d at 897 n. 1. Our analysis focused on A.R.S. § 43–1131, which allows inclusion of gross receipts in the sales factor "unless the context otherwise requires." *Id.* at 74, ¶ 14, 97 P.3d at 899. We also considered a Multistate Tax Commission report recommending "that only net gains from the sale or other disposition of intangible personal property be included in the sales factor." *Id.* at 76, ¶ 20, 97 P.3d at 901.

¶ 19 We held that the term "sale" was not susceptible to a plain meaning construction and "the context of the transaction must be considered in determining whether a 'sale' actually occurred." *Id.* at 76, ¶ 21, 97 P.3d at 901. We accepted the Department's contention that including the return of principal would result in double-counting the same receipts: first, as revenue generated from retail sales, and second, as additional revenue received from excess cash investments. *Id.* at 74, ¶ 14, 97 P.3d at 899. Consequently, properly construed, A.R.S. § 43–1131 allows only the net gain from short-term investments to be included as a "sale." *Id.; but see Microsoft Corp. v. Franchise Tax Bd.*, 39 Cal.4th 750, 47 Cal.Rptr.3d 216, 139 P.3d 1169, 1173–81 (2006) (holding that gross receipts were not limited to net proceeds and including the entire amount received when the taxpayer redeemed its securities at maturity, but then applying the relief provision).

¶ 20 On appeal, the Department contends that the reasoning of Walgreen applies to this case because MDC "is disposing of the mortgages and servicing rights on the very same homes that it builds and sells."[4] It argues that the sale of the home and the disposition of the mortgage should be considered as one transaction in substance because Richmond American and HomeAmerican are parts of a unitary business, so any transac-

---

**4.** In fact, not all of the mortgages originated by HomeAmerican were used to buy Richmond American homes. Neither party quantifies this amount, but there is no dispute that such mortgages exist. Similarly, some of MDC's home buyers did not obtain financing through Ho-

meAmerican. These transactions are not at issue. The transactions were complete at the time of sale for buyers who paid cash or obtained outside financing. MDC received its cash proceeds from the sale and there was no mortgage to sell on the secondary market.

tion by one is considered to be by both. Under this argument, MDC records the home's selling price in its sales factor at the time the home is sold even though most of the sales receipts consist of a mortgage receivable. If MDC held the mortgage and received payments from the homebuyer, only the interest portion of the payments would be considered a new sale to be included in the sales factor. The receipt of the principal portion would not be considered a part of gross receipts. The Department argues that the sale of the mortgage on the secondary market should not lead to a different result. The purpose of the sale is to generate cash from the return of principal so that HomeAmerican can make more loans. Consequently, the sale of the mortgage is simply the completion of the mortgage receivable component of the home sales.

¶ 21 MDC responds that *Walgreen* is not on point because its activities represent the sale of inventory, as opposed to a treasury function. It points out that federal law treats MDC and similar entities as "dealers in securities" because they are merchants that hold securities like mortgages as inventory in the ordinary course of trade or business. 26 U.S.C. § 475(c)(1); 26 C.F.R. § 1.471–5 (for inventories by dealers in securities, "a dealer in securities is a merchant of securities regularly engaged in the purchase of securities and their resale to customers"); Rev. Rul. 72–523, 1972–2 C.B. 242 ("A mortgage corporation engaged in the business of originating mortgage loans for profitable sale to customers qualifies as a dealer in securities and may inventory the mortgages held for sale."); *accord Walter E. Heller W., Inc. v. Ariz. Dep't of Revenue*, 161 Ariz. 49, 53, 775 P.2d 1113, 1117 (1989) (analogizing a lender's costs of borrowing funds to make loans to "the costs of a merchandise retailer in procuring his inventory"). MDC also argues that sales of homes and sales of mortgages are separate transactions and that the Department's position would treat a mortgage company connected to a homebuilder differently than an independent company.

¶ 22 Our decision in *Walgreen* recognized that the context of a business transaction using financial instruments as cash-equivalents may require excluding the return of principal from the sales factor under UDITPA. As we understand the Department's argument, it considers MDC's short-term holding of mortgages, whether originated by it or separately acquired from a third-party, to be the equivalent of the treasury function we discussed in *Walgreen*. Although we recognize that there are differences between short-term cash investments and mortgages, given the short-term nature of MDC's ownership of those mortgages, we agree with the Department. Excluding the proceeds of the mortgage sales that represent the return of principal from the sales factor prevents an artificial distortion of the apportionment factors. As noted above, MDC seeks to increase the denominator of the sales factor by over five hundred million dollars, although its net income from such sales was less than one percent of that amount and was also less than its fees from loan origination. Making a profit from a sale does not determine whether the gross receipts from the sale are includible in the sales factor. Nevertheless, in the context of this case we believe it shows that MDC's main purpose in selling the mortgages was to recover its principal, thus making its situation analogous to the treasury function in *Walgreen*.

¶ 23 We also find that HomeAmerican's own activities as a mortgage company provide support for determining that only its net proceeds from selling mortgages should be included in the denominator of the sales factor. Unlike a business which simply purchases inventory for cash and turns around and sells it to generate new cash, HomeAmerican is actually engaged in a two-sided business, each of which involves intangible assets. On the one hand, HomeAmerican sells money to homebuyers in exchange for fees and secured promises to repay (mortgages and associated servicing rights). As our supreme court has recognized, for UDITPA purposes this is analogous to the "sale" of a "product" within Arizona. *Heller W.*, 161 Ariz. at 53, 775 P.2d at 1117 (discussing "the money (which is the 'product' that it has

'sold' to Arizona customers)"). The other side of HomeAmerican's business is selling the mortgages and servicing rights, hopefully at a profit, but at least at a level sufficient to obtain the return of principal so that new mortgages may be sold to consumers buying or refinancing homes.

¶ 24 None of the parties dispute that when HomeAmerican "sells" a mortgage to a homebuyer only the origination fees and any interest received on the loans should be included in the UDITPA sales factor. The mortgage principal is not included. In effect, only the net proceeds from the mortgage origination is included in the sales factor. Thus, although HomeAmerican's business involves originating hundreds of millions of dollars of mortgage loans, it only includes a fraction of that amount in the sales factor. Given this, including the gross receipts from the matching transactions (the sales of the mortgages on the secondary market) would artificially distort the sales factor because the principal of the mortgage would be included in only one side of the transaction.

¶ 25 "The purpose of the sales factor is to tax an entity for the benefits it receives by exploiting a market *in that state.*" *Walgreen,* 209 Ariz. at 74, ¶ 17, 97 P.3d at 899. Walgreen showed that including the gross receipts from the turnover of financial instruments may artificially distort the sales factor. Whether considering HomeAmerican's position as a part of MDC's unitary business or looking only to its own activities as a mortgage lender, we conclude that the same would be true by including in the denominator of the sales factor the gross proceeds from selling mortgages to investors.

¶ 26 As in *Walgreen,* our rationale is also supported by the interpretation of UDITPA by the Multistate Tax Commission. With regard to the sale of loans, it has recommended that the sales factor include only "net gains." *Recommended Formula for the Apportionment and Allocation of Net Income of Financial Institutions,* Sec. 3(f) (Adopted Nov. 17, 1994), available at www. mtc.gov/uploadedFiles/Multistate_Tax_

Commission/Uniformity/Uniformity_Projects/ A_-_Z/FormulaforApportionmentofNet IncomeFinInst.pdf (last visited Aug. 26, 2009). Although Arizona has not specifically adopted this recommendation, for the reasons discussed above, we conclude that its application to the "context" of this case is reasonable as a means of fairly apportioning MDC's business.

¶ 27 MDC argues, however, that the Arizona Legislature rejected the use of net income in this context through its rejection of Senate Bill 1273 in 1996, the tax year at issue in this case. The bill would have essentially adopted the language recommended by the Multistate Tax Commission by amending the tax statutes to include in the sales factor only net gains from financial institutions' mortgage sales of loans. Initially, we observe that the rejection of this bill is not a wholly reliable tool for statutory construction purposes. *See Ontiveros v. Borak,* 136 Ariz. 500, 512, 667 P.2d 200, 212 (1983), *superseded on other grounds by* A.R.S. §§ 4–311, 4–312; *Fund Manager, Pub. Safety Pers. Ret. Sys. v. Ariz. Dep't of Admin.,* 151 Ariz. 93, 96, 725 P.2d 1127, 1130 (App.1986). In fact, it may be that the Legislature considered the legislation superfluous. In any event, the broad scope of the unpassed legislation makes it impossible to discern the precise intent of the legislature.

¶ 28 Accordingly, we hold that only the net gain or loss on the secondary sales of mortgages and mortgage servicing rights is properly included in the sales factor's denominator. This holding makes it unnecessary to address whether A.R.S. § 43–1148 also precludes including gross receipts in the sales factor because those amounts do not fairly represent the extent of MDC's business in Arizona.

## II. The Numerator of the Arizona Sales Factor Should Not Include the Net Proceeds from the Sales of Mortgage Loans or the Sales of Mortgage Servicing Rights When the Costs of Performance Are Not Incurred In Arizona.

¶ 29 The parties also dispute what amounts are properly included in the sales

factor's numerator. The numerator includes MDC's receipts attributable to Arizona during the tax period. MDC's original return included within the Arizona numerator the net gain from the sales of mortgages secured by Arizona real property and sales of servicing rights on Arizona properties. In its amended return and on appeal, MDC argues this was incorrect because any gain on those sales was properly attributable to Colorado, where the corporate personnel who effectuated the sales were located.

¶ 30 For sales factor purposes, receipts from the sale, lease, rental, or licensing of real or tangible personal property are attributable to this state if the property is located in this state. A.C.C. R15–2D–806(3). In the case of tangible personal property, sales are "sourced" to Arizona and included in the numerator when the goods are shipped or delivered to a purchaser within this state. A.R.S. § 43–1146. Sales of property other than tangible personal property are attributed to Arizona if either (1) the income-producing activity is performed in this state, or (2) a greater proportion of the income producing activity is performed in this state than in any other state, based on costs of performance. A.R.S. § 43–1147; *see also* A.A.C. § R15–2D–806(1) ("The term 'income-producing activity' applies to each separate item of income and means the transactions and activities directly engaged in by a taxpayer in the regular course of its trade or business for the ultimate purpose of obtaining gains or profit.").

¶ 31 In *Heller Western* the Arizona Supreme Court addressed "whether interest income earned by Heller Western on loans to Arizona customers should be included in the numerator of the sales factor." 161 Ariz. at 50, 775 P.2d at 1114. Heller Western loaned money to commercial borrowers. *Id.* Funds for lending were generated by its California-based parent. *Id.* Heller Western argued its interest costs in obtaining these funds must be considered in assessing whether a greater proportion of its costs of performance were incurred outside Arizona, with the result that none of the interest paid by Ari-

zona customers would be attributed to Arizona. *Id.* at 52, 775 P.2d at 1116. The supreme court rejected this argument, explaining that "income producing activity ... contemplates only direct sales payment activity by the consumer." *Id.* The income-producing activity in *Heller Western* was the commercial financing company's offering of loans and the relevant cost of performance did not include the taxpayer's cost of borrowing money used to make loans. *Id.* at 52–53, 775 P.2d at 1116–17. The supreme court explained that UDIPTA preserves a customer-based focus, *id.* at 52, 775 P.2d at 1116, and procurement is not itself an income-producing activity. *Id.* at 53, 775 P.2d at 1117.

¶ 32 MDC relies on *Heller Western* for its claim that none of its proceeds from the sale of mortgages on the secondary market are attributable to Arizona. It argues that mortgages are an intangible asset without a fixed location, so determining to which state the proceeds of sale are attributed must be based on an analysis of the costs of performance. It presents evidence, not seriously disputed by the Department, that all secondary marketing activities took place in Colorado, including packaging the mortgages for sale and negotiating with purchasers. Based on these facts, MDC argues that the situation here is essentially the reverse of that in *Heller Western*, in that although the mortgages may originate in Arizona, all activities relating to the sales of the mortgages take place in a different state. Consequently, any gain on sale is not includible in the numerator of the Arizona sales factor.

¶ 33 MDC correctly points out that mortgages are generally considered to be intangible personal property and the location of a mortgage for tax purposes is not regarded as the same as the underlying property. This is true even though MDC's mortgages are secured by Arizona real property. The somewhat counterintuitive result of applying this fact to the Arizona statutory scheme is that income related to the sale of property plainly tied to Arizona may be attributable to a different state. *See* Jerome R. Hellerstein &

Walter Hellerstein, *State Taxation,* ¶ 9.18[2][a], at 9–212 (3d ed. 2007 & Supp. 2007) ("In the typical case involving real estate rents that constitute business income, the owner-lessor is likely to conduct most of its activities relating to the leased property in the state in which the property is located.... In other cases, however, a corporation's income-producing activities with respect to property may not occur in the same state in which the property is located.").

¶ 34 Recognizing this difficulty, the Multistate Tax Commission has proposed a rule for financial institutions that would more closely link income and the state in which property is located. Under its recommended approach, "[r]eceipts from loans secured by real property are generally assigned to the state where the property is located." Hellerstein & Hellerstein, *supra,* ¶ 10.06[3][a] at 10–62 (citing MTC Reg. IV.18(i)(3)(d)). This approach is a reasonable method of apportioning a taxpayer's income from the sale of mortgages. Unlike unsecured debts or similar intangibles that have no fixed location, it is possible to definitively identify the location of the business activity involving the mortgages as being within a state. In this case, MDC's personnel in Colorado may have arranged to sell the mortgages to out-of-state investors, but what the investors buy is inextricably connected to Arizona. Whether the mortgagee who must pay the promissory note associated with the mortgage is located in Arizona or some other state, the mortgage itself represents a recorded security interest in Arizona property. Consequently, unlike intangibles having no location, for purposes of identifying the source of the receipts from a mortgage it is reasonable to find that the property generating the income is in Arizona.

¶ 35 Nevertheless, as noted above, Arizona has not expressly adopted the Multistate Tax Commission's proposed regulations. Therefore, any attribution of MDC's income from selling its mortgages must be pursuant to the specific language of A.R.S. § 43–1147, which broadly applies to "[s]ales, other than sales of tangible personal property." In *Walgreen,* and the first part of this opinion, we relied upon the qualifying language in the definition of "sales" in A.R.S. § 43–1131 "unless the context requires otherwise." Section 43–1147 does not contain any similar language. Consequently, we must determine the appropriate allocation of MDC's income from the sales of mortgages applying the specific provisions of A.R.S. § 43–1147.[5] That language requires us to look to the cost of performance of the income producing activity, not the location of the property connected to the income.

¶ 36 We must also apply *Heller Western,* which directs the Department to look only to the costs of performance related to income producing activities such as "direct solicitation, negotiation, and sales activities with consumers in this state." 161 Ariz. at 53, 775 P.2d at 1117. In this case, that means the costs of selling the mortgages on the secondary market. Because the Department's own rule requires that each income producing activity be considered separately, we reject its argument that we should also consider the costs of building and selling the homes. The specific income producing activity at issue here is the income from the sale of mortgages.

¶ 37 Applying these authorities, we conclude that a greater proportion of the income producing activity related to the sales of mortgages on the secondary market is performed outside Arizona. The only evidence in the record regarding the cost of performance states that all costs directly associated with selling the mortgages occurred in Colorado. Therefore, MDC could properly exclude the net income from the sales of mortgages from the numerator of its Arizona sales factor.

---

**5.** *See also* Hellerstein & Hellerstein, *supra,* ¶ 9.18[2][b], at 9–215–16 (discussing a proposed MTC rule attributing rents from property to the state in which the property is located: "This is a sensible rule, but unfortunately it does not respond to, and in fact is contrary to, the statutory test, since the statute provides that the extent of 'income-producing activity' performed in a state is measured by 'costs of performance,' not the location of the property.").

¶ 38 We reach the same conclusion with regard to the sales of mortgage servicing rights. Indeed, income from servicing rights is even less tied to a particular state than income from loans secured by real estate. As far as the record before us reflects, mortgage servicing rights arise out of a contract between the servicing company and the mortgage owner. As such, they do not represent a security interest in the underlying property, nor are they necessarily publicly recorded. Unlike the contract between the mortgage owner and mortgagee, which by definition represents a recorded security interest, servicing rights contracts need not have a direct legal connection with the state in which the property is located. The mortgage owner, mortgagee, and servicing company could all be located outside the state. The servicing company's only direct connection with the state may be sending tax payments to the appropriate taxing authorities, and it will do so pursuant to its contractual obligation with the mortgage owner, not the property owner or taxing authority. Because the record in this case shows that all MDC's costs of generating the income from the sales of servicing rights were incurred in Colorado, we conclude that the income from those sales could be excluded from the numerator of the Arizona sales factor.

## CONCLUSION

¶ 39 We affirm the tax court's refusal to include gross receipts in the sales factor denominator. We reverse its ruling that the numerator must include the net gain on the sale of mortgages secured by Arizona properties and the gain on sales of servicing rights. Therefore, MDC's amended return for 1996 should have been allowed, in part. On remand, the tax court shall recalculate MDC's apportionment formula for 1996 and determine the amount of any tax refund due. Finally, although MDC prevailed in part, it did not prevail on the major issue, so we deny its request for attorneys' fees incurred in the tax court and in this appeal under A.R.S. § 12–348(B)(1) (2003). Because it prevailed in part, we award MDC its costs on appeal upon its compliance with Rule 23, Arizona Rules of Civil Appellate Procedure.

CONCURRING: LAWRENCE F. WINTHROP, Presiding Judge, and PHILIP HALL, Judge.