229 P.3d 266

**R.R. DONNELLEY & SONS COMPANY, a Delaware corporation; R.R. Donnelley Receivables, Inc., a Nevada corporation; Heritage Preservation Corporation, a South Carolina corporation; Caslon Incorporated, a Delaware corporation, Plaintiffs–Appellees/Cross–Appellants,**

v.

**ARIZONA DEPARTMENT OF REVENUE, Defendant–Appellant/Cross–Appellee.**

**No. 1 CA–TX 08–0007.**

Court of Appeals of Arizona, Division 1, Department T.

April 29, 2010.

Steptoe & Johnson LLP By Patrick Derdenger, Bennett Evan Cooper, Randall T. Evans, Phoenix, Attorneys for Plaintiffs–Appellees/Cross–Appellants.

Terry Goddard, Attorney General By Kimberly J. Cygan, Assistant Attorney General, Phoenix, Attorneys for Defendant–Appellant/Cross–Appellee.

Bancroft Susa & Galloway, PC By Michael G. Galloway, James M. Susa, Phoenix, Attorneys for Amicus Curiae Home Depot USA, Inc. and Affiliates.

Morrison & Foerster LLP By Eric J. Coffill (Admitted pro hac vice), Carley A. Roberts (Admitted pro hac vice), Sacramento, CA, Attorneys for Amicus Curiae Home Depot USA, Inc. and Affiliates.

## OPINION

BARKER, Judge.

¶ 1 This is a corporate income tax case. The Arizona Department of Revenue (the "Department" or "ADOR") appeals the Arizona Tax Court's grant of summary judgment in favor of R.R. Donnelley & Sons Co. ("Taxpayer"), R.R. Donnelley Receivables, Inc. ("Receivables"), Heritage Preservation Corp. ("Heritage"), and Caslon Inc. ("Caslon") (the latter three, collectively, the "Subsidiaries"). The tax court upheld Taxpayer's right to exclude Receivables and Caslon from its combined Arizona tax return but required it to include Heritage. Taxpayer cross-appeals from the portion of the judgment concerning Heritage. For the reasons that follow, we affirm.

### Facts and Procedural Background

¶ 2 During tax years 1990 to 1999, Taxpayer was a Delaware corporation with its principal place of business in Chicago. It operated a worldwide commercial printing business and maintained a sales office in Arizona.

¶ 3 The Subsidiaries performed different functions during the relevant time period. Receivables was a Nevada corporation that purchased accounts receivable and engaged in factoring. Caslon was a Delaware corporation that supplied investment management services and was separately managed by Delaware Corporate Management in Wilmington, Delaware. Heritage was a South Carolina corporation that held and managed trademarks transferred to it by Taxpayer. The trademarks were then licensed back to Taxpayer under a non-exclusive agreement.

¶ 4 Taxpayer, together with some of its affiliated corporations, filed combined Arizona corporate income tax returns for the tax years 1990 to 1999. These tax returns did not include the Subsidiaries. After an audit, the Department assessed Taxpayer for additional income tax and interest for tax years 1990 to 1999. The Department's audit report attributed additional income from the Subsidiaries, along with other entities, to Taxpayer as a unitary group under the Arizona Uniform Division of Income for Tax Purposes Act ("UDITPA"), Arizona Revised Statutes

("A.R.S.") sections 43–1131 to –1150 (2006 & Supp.2009).

¶ 5 After Taxpayer protested, the Department issued a modified assessment based upon Taxpayer's amended returns. The parties then executed a partial closing statement resolving all issues except the inclusion of the Subsidiaries' income in the combined return.

¶ 6 A Department hearing officer conducted a hearing and found that the Subsidiaries were operationally integrated with Taxpayer and should be taxed with Taxpayer as a unitary business. The Board of Tax Appeals reached the same conclusion on appeal.

¶ 7 In accordance with A.R.S. § 42–1253(A), Taxpayer appealed to the tax court. The Department answered, and the parties filed cross-motions for summary judgment on the application of the unitary business principle to the Subsidiaries' income. After a hearing, the tax court held that the Department could not properly attribute income from Receivables and Caslon to Taxpayer but could attribute income from Heritage.

¶ 8 Taxpayer filed an unsuccessful motion for reconsideration. The tax court then awarded Taxpayer $30,000.00 in attorneys' fees pursuant to A.R.S. § 12–348(B)(1) (2003). This appeal and cross-appeal followed.

### Discussion

¶ 9 We review the tax court's ruling on summary judgment de novo. *Wilderness World, Inc. v. Ariz. Dep't of Revenue*, 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995). The tax court's interpretation of relevant statutes is also subject to de novo review. *M.D.C. Holdings, Inc. v. State ex rel. Ariz. Dep't of Revenue*, 222 Ariz. 462, 467, ¶ 12, 216 P.3d 1208, 1213 (App.2009). To address whether the trial court properly determined two of the subsidiaries (Receivables and Caslon) were not part of a unitary business and one of the subsidiaries (Heritage) was part of a unitary business, it is helpful to set forth the legal framework applicable to all three.

### 1. Legal Framework

#### A.

¶ 10 Arizona taxes "the entire Arizona taxable income of every corporation." A.R.S.

§ 43–1111 (2006). A corporate taxpayer doing business in Arizona and receiving income from a source within Arizona must file a corporate income tax return. *Id.* § 43–102(A)(5) (2006).

¶ 11 In the case of an affiliated group of corporations with operations in multiple states, courts apply the "unitary-business" principle to determine whether a particular member of the affiliated group has the requisite minimal state connection to include its income in the tax base. *See F.W. Woolworth Co. v. Taxation & Revenue Dep't*, 458 U.S. 354, 362, 102 S.Ct. 3128, 73 L.Ed.2d 819 (1982) (the "linchpin of apportionability" for state income of an interstate enterprise is the unitary business principle); *see generally* William Meade Fletcher, 14A Fletcher Cyc. Corp. § 6907 (Sept.2009). An out-of-state corporation will not have the required connection to Arizona to justify inclusion of its income in the tax base unless it is part of a unitary business that is carried out within and without the state. 1 Jerome R. Hellerstein & Walter Hellerstein, State Taxation ¶ 8.07[1] (2000) (hereinafter "Hellerstein").

¶ 12 If affiliated corporations do comprise a unitary business, Arizona requires them to file a combined Arizona tax return. Ariz. Admin. Code ("A.A.C.") R15–2D–401(B) ("If the unitary business consists of more than one corporation, the corporations comprising the unitary business shall file a combined return apportioning the business income of the corporations using a single apportionment formula."); *Id.* R15–2D–101 (defining "combined return"). The combined income is then apportioned to Arizona under UDIT-PA.

**B.**

¶ 13 In 1994, the Arizona standard for unitary business determinations was enunciated in *State ex rel. Arizona Department of Revenue v. Talley Industries, Inc.*, 182 Ariz. 17, 893 P.2d 17 (App.1994). The question we confronted was whether the combined reporting of the overall net income of twenty-six members of the Talley group was required to clearly reflect taxable income earned under A.R.S. § 43–497(A). *Id.* at 19, 21, 893 P.2d at 19, 21. Talley's subsidiaries (1) manufactured and supplied commercial and high technology products; (2) made time-keeping instruments; (3) imported men's and women's apparel; and (4) bought and sold property. *Id.* at 19, 893 P.2d at 19. Talley argued that its various subsidiaries constituted a unitary business based on their functional integration. *Id.* at 22, 893 P.2d at 22. In *Talley*, it was the taxpayer that argued for combined reporting, seeking to utilize losses from its subsidiaries to reduce its taxable income. *Id.* at 17–18, 893 P.2d at 17–18. In the case before us, it is just the opposite. It is the Department that seeks a finding of a unitary business in order to attribute gains from the Subsidiaries to Taxpayer to increase the amount of income the Department can tax.

¶ 14 In *Talley*, we spent considerable time discussing the various approaches to determining whether a business is unitary. *Id.* at 21–25, 893 P.2d at 21–25. After describing "a continuum of alternative formulae" beginning with a broad test in California and a narrow test in Louisiana and Mississippi, *id.* at 23, 893 P.2d at 23, we found that "a rational compromise between the broad California three-unities test and the unduly restrictive approach at the other end of the spectrum" was an "intermediate approach" adopted in Pennsylvania and recommended by the Hellerstein treatise. *Id.* at 23, 893 P.2d at 23; *see Pennsylvania v. ACF Indus., Inc.*, 441 Pa. 129, 271 A.2d 273 (1970). We found persuasive Hellerstein's explanation of this intermediate approach:

> The recognition that an enterprise is not unitary unless, inter alia, there is a substantial interdependence of basic operations among the various affiliates or branches of the business provides a quantifiable, objective test of the unitary business . . . .
>
> Minor or insubstantial transactions or interrelations between segments of a business ought not suffice for treatment as a unitary business. *Inherent in the concept that a business is sufficiently integrated and interdependent to warrant apportionment by a formula that is applied to the entire tax base of the multi-state or multi-national enterprise is the assumption that*

*the interrelations and interdependence are substantial.*

*Id.* at 24, 893 P.2d at 24 (quoting Hellerstein ¶ 8.11[5] at 8–92 and ¶ 8.11[4][c] at 8–90 to 8–91) (emphasis added in *Talley* ).

¶ 15 Although Talley had argued that it controlled its subsidiaries through centralized management, centralized departments, centralized borrowing, sharing of technical and management expertise, common benefits, a common logo, and common officers and directors, we held those factors did not qualify Talley as a unitary business. *Id.* at 19, 893 P.2d at 19. We explained:

> Notwithstanding the above, the record establishes no substantial interrelationship between the subsidiaries. There were no transfers of materials, products, goods, technological data relating to products, processes, machinery, or equipment by subsidiaries operating wholly outside Arizona to subsidiaries with operations in Arizona. Also, virtually no flow of product and no vertical or horizontal integration of business operations exists between the subsidiaries with, and those without, income-producing factors and business operations in Arizona. *No basic operational ties existed between the two Arizona real estate subsidiaries and any other Talley subsidiary.*

*Id.* (emphasis added).

¶ 16 A key factor in the *Talley* analysis is the distinction between "basic operations" and "accessory" functions. *Id.* at 25, 893 P.2d at 25. *Talley* explains that the unitary business doctrine was formulated to address the accounting difficulties associated with horizontally integrated enterprises operating across state lines, including railroads and telegraph companies, and vertically integrated manufacturing, producing, and mercantile companies. *Id.* Under *Talley*, those types of businesses may be considered unitary businesses "because of the inability to determine, under any practicable separate accounting method, the amount of income properly at-

tributable to the various stages of the enterprise conducted in particular States." *Id.* (quoting Hellerstein ¶ 8.11[4][b] (now ¶ 8.09) ). That same consideration does not exist, at least not to the same extent, with "centralized management or control, financing, research, legal, accounting, or other internal services rendered by one branch or affiliate to another." *Id.* These services "may be considered as an accessory to the operations of the business" and "can be charged to the various operations by using generally accepted accounting methods." *Id.*

¶ 17 Our discussion of accessory services, however, did not turn solely on whether income could properly be attributable to the various stages of an operation. In determining whether services were accessory, and not part of the operations of the business, we noted that "[s]uch services are *not* contained in the product or its delivery to the customer." *Id.* at 25, 893 P.2d at 25 (emphasis added). We determined that when services are accessory, "for the most part, the services are not embodied in the product or its delivery to the customers of Talley." *Id.* We further emphasized that when services are accessory they "are not 'so pervasive as to negate function[al] independ[ence]' of the subsidiaries." *Id.* (*citing ACF Indus.,* 271 A.2d at 279). Importantly, we did not lose sight of "the fundamental question," which was "whether combined reporting of overall net income by the Talley group was necessary to clearly reflect the taxable income earned by those subsidiaries with Arizona income factors." *Id.*

### C.

¶ 18 Arizona Administrative Code regulations also aid us in determining whether Taxpayer and any of the Subsidiaries constitute a unitary business. A current regulation, A.A.C. R15–2D–401, is substantially similar to the regulation in effect during the audit period, A.A.C. R15–2–1131 (1999).[1] Pursuant to A.A.C. R15–2D–401:

> istics for a business to be considered a single unitary business, the presence of these three characteristics is not sufficient without evidence of substantial operational integration. Some of the factors of a single unitary business

1. The 1999 version of A.A.C. R15–2–1131(E) provides relevant part:
   > While common ownership, common management and reconciled accounting systems of components are necessary threshold character-

D. The following are necessary threshold characteristics for components of an entity, an entity, or a group of entities to be considered a unitary business:

1. The entities comprising the unitary business are owned or controlled, directly or indirectly, by the same interests that collectively own more than 50 percent of the voting stock,

2. The entities or components share common management, and

3. The entities or components have reconciled accounting systems.

E. The presence of the three characteristics listed in subsection (D) is not sufficient for a business to be considered unitary without evidence of substantial operational integration. Factors that indicate operational integration include the following:

1. The same or similar business conducted by components;

2. Vertical development of a product by components, such as manufacturing, distribution, and sales;

3. Horizontal development of a product by components, such as sales, service, repair, and financing;

4. Transfer of materials, goods, products, and technological data and processes between components;

5. Sharing of assets by components;

6. Sharing or exchanging of operational employees by components;

7. Centralized training of operational employees;

8. Centralized mass purchasing of inventory, materials, equipment, and technology;

9. Centralized development and distribution of technology relating to the day-to-day operations of the components;

10. Use of common trademark or logo at the basic operational level;

11. Centralized advertising with impact at the basic operational level;

12. Exclusive sales-purchase agreements between components;

13. Price differentials between components as compared to unrelated businesses;

14. Sales or leases between components; and

15. Any other integration between components at the basic operational level.

A.A.C. R15–2D–401(D)–(E). The regulation further provides that not every factor listed in section (E) need be present in every unitary business. *Id.* R15–2D–401(F).

¶ 19 Against this backdrop, we consider whether Receivables, Caslon, and Heritage were part of Taxpayer's unitary business. Pursuant to A.R.S. § 42–1255 (2006), the Department bears the burden of proving by a preponderance of the evidence any factual issue that is relevant to ascertaining Taxpayer's tax liability.

## 2. *Receivables*

■ ¶ 20 Receivables was in the business of purchasing and factoring accounts receiv-

which indicate basic operational integration are:
1. The same or similar business conducted by components;
2. Vertical development of a product by components, i.e., manufacturing, distribution and sales;
3. Horizontal development of a product by components, i.e., sales, service, and repair financing;
4. Transfer of materials, goods, products, and technological data and processes, [sic] between components;
5. Sharing of assets by components;
6. Sharing or exchanging of operational employees by components;
7. Centralized training of employees;
8. Centralized mass purchasing of inventory, materials, equipment, technology, etc.;
9. Centralized development and distribution of technology relating to the on-going day to day operations of the components;
10. Use of common trademark or logo at the basic operational level, centralized advertising with impact at the basic operational level;
11. Exclusive sales-purchase agreements between components;
12. Price differentials between components as compared to unrelated businesses;
13. Sales or leases between components;
14. Other contributions between components at the basic operational level. All of the above factors need not be present in every unitary business, but factors indicating substantial integration at the basic operational level should be evident.

able, mainly for Taxpayer. An entity that conducts factoring by purchasing accounts receivable without recourse "is engaged in a type of financing" business. *Manhattan Factoring Corp. v. Orsburn,* 238 Ark. 947, 385 S.W.2d 785, 789 (1965). During the audit period, Receivables purchased accounts receivable pursuant to a 1987 agreement with Taxpayer, and also performed collections, analysis of balances, and maintenance of books and records. Though ninety percent of Receivables' factoring income during the audit period came from Taxpayer, Receivables purchased the accounts without recourse and at a price determined by a multi-factor formula. Receivables also received significant revenue from third-party purchases: $6,762,410.00 in 1997, $6,461,253.00 in 1998, and $6,169,917.00 in 1999.

¶ 21 Receivables' activities were similar to, yet less extensive than, the functions that failed to establish a unitary business in *Talley.* While Receivables entered into the operating agreement that required it to sell, assign, and transfer rights, title, and interest in accounts payable for Taxpayer, Talley "borrowed funds, incurred corporate office costs, and acted as banker for its subsidiaries." *Talley,* 182 Ariz. at 19, 893 P.2d at 19.

¶ 22 The Department stresses that "there are many businesses that should be characterized as unitary based on the interdependence of basic operations, even though that interdependence may be reflected in the flow of services or intangible values rather than a flow of goods." *See* Hellerstein ¶ 8.09[4][b]. We address this issue concerning intangibles more fully in our discussion with regard to Heritage. *Infra* ¶ 39. As to Receivables, however, suffice it to say that to be consistent with *Talley* such services and intangibles must be operational components of the core business "contained in the product or its delivery," as opposed to mere accessories such as "centralized management and control, financing, research, legal, accounting, and other internal services." *Talley,* 182 Ariz. at 25, 893 P.2d at 25; Hellerstein ¶ 8.09[4][b].

¶ 23 Further, the Department fails to distinguish the factoring services at issue here from those performed for any other large

company. Many businesses contract with third-party factors. *See SunTrust Bank, Nashville v. Johnson,* 46 S.W.3d 216, 219–20 (Tenn.App.2000); *see also Van Waters & Rogers, Inc. v. Interchange Resources, Inc.,* 14 Ariz.App. 414, 416, 484 P.2d 26, 28 (1971). In this case, Taxpayer contracted with Receivables to perform factoring; if it had contracted instead with an unrelated factoring company, there would be no contention that a unitary business resulted. *See Visa, U.S.A., Inc. v. Birmingham Trust Nat'l Bank,* 696 F.2d 1371, 1375 (Fed.Cir.1982) (finding that a supermarket chain's customer check cashing service "was not ... the firm's grocery business but ... a service ancillary to that business").

¶ 24 Moreover, there is no contention by the Department that the transactions between Receivables and Taxpayer were at anything other than a fair market price. As *Talley* instructs, "[t]he problem with separate accounting in a unitary business is the *'inability to establish fair arms's-length* [sic] *prices for goods transferred,* or basic operational services rendered, between controlled branches or subsidiaries of an enterprise.'" 182 Ariz. at 25, 893 P.2d at 25 (emphasis added). Taxpayer's relationship with Receivables does not pass this portion of the *Talley* test. We caution, however, that the ability to determine income (and whether an arm's-length negotiation took place) is not the *entire* test to determine whether a business is unitary. *Talley* emphasized that the "fundamental question ... is whether combined reporting ... [is] *necessary to clearly reflect the taxable income earned* by those subsidiaries with Arizona income factors." *Id.* (emphasis added).

¶ 25 Receivables did not pass the unitary business test established in *Talley.* The services it performed were accessory. We need not engage in an extensive discussion of the other factors set forth in A.A.C. 15–2D–401 when the undisputed facts show that Receivables fails to meet the standard enunciated in *Talley.*

### 3. Caslon

■ ¶ 26 Caslon's services likewise failed to satisfy the test set forth in *Talley.* Cas-

lon's activities during the audit period included buying and selling investment assets; receiving dividends, interest, and other passive income; and borrowing and lending money at arm's length to Donnelley Printing Group members. Most of Caslon's property consisted of intangible personal property investment assets. Caslon and Taxpayer did not share any employees, advertising, legal services, or centralized purchasing.

¶ 27 Like Receivables' activities, Caslon's activities constituted accessory services rather than basic operational activities. To the extent intangible assets were involved (the investment assets), they were neither embodied in the product nor its delivery. As we discuss below, this distinguished Receivables from Heritage. Receivables dealt with intercompany financing. The *Talley* court rejected the argument that intercompany financing supported a unitary finding: "Talley also borrowed funds, incurred corporate office costs, and acted as banker for its subsidiaries," 182 Ariz. at 19, 893 P.2d at 19, and concluded that such activities, like "other internal services rendered by one branch or affiliate to another," are merely "an accessory to the operations of the business." *Id.* at 25, 893 P.2d at 25; *accord Louis Dreyfus Corp. v. Huddleston,* 933 S.W.2d 460, 464–70 (Tenn.App.1996) (holding that a taxpayer's non-domiciliary bond trading division was not unitary with its other divisions dealing in agricultural commodities); *Cent. Nat'l–Gottesman, Inc. v. Dir., Div. of Taxation,* 14 N.J.Tax 545, 556 (1995) ("It is not unusual for a division to be devoted to managing investments unrelated to operational divisions and for that investment activity to be other than unitary with the activities of the corporation's operating divisions.").

¶ 28 As these cases reflect, many businesses engage in investment activities unrelated to their core functions. The investments generate dividends and interest. The companies may also engage in intercompany borrowing and lending. Just as the factoring argument does not advance the analysis as to Receivables, the Department's argument as to financing is not persuasive as to Caslon. Applying the test from *Talley,* Caslon's activities were accessory services. Thus, the tax

court did not err in determining that Caslon was not part of the unitary business.

### 4. Heritage

#### A.

¶ 29 Taxpayer formed Heritage as a subsidiary in 1995 to hold and manage its trademarks. Taxpayer transferred its trademarks to Heritage, and Heritage entered into a formal license agreement with Taxpayer in which it granted Taxpayer a non-exclusive license to those same trademarks in exchange for royalties. Heritage employed one person to perform administrative tasks related to trademark management. Though the licensing agreement was non-exclusive, Heritage did not license any entity other than Taxpayer to use the trademarks, nor was there any evidence that it had *attempted* to market the use of these trademarks to any other entity.

¶ 30 The tax court concluded that Taxpayer must include Heritage in the combined return under the theory that the trademarks could not be separated from the original holder of the marks: Taxpayer. Taxpayer asserts the tax court erred. We agree the tax court's reasoning was flawed. The tax court mistakenly based its finding of unitary operations on the premise that trademarks are intrinsically tied to historical users as a matter of law. However, owners such as Heritage may license third parties to use the trademarks even though the third parties did not use them historically. The law permits trademark licensing "under *any* circumstances where the licensor exercises quality control over goods and services that reach the customer under the licensed mark." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3.11 (4th ed. Sept.2009) (hereinafter *"McCarthy on Trademarks"*) (emphasis added). Accordingly, "the benefits of the licensee's use accrue to the trademark owner." Restatement (Third) of Unfair Competition § 33 cmt. B (1995); Note, *Quality Control and the Antitrust Laws in Trademark Licensing,* 72 Yale L.J. 1171, 1173 (May 1963) (noting the rationale for trademarks as representations of product quality). Trademark ownership rights "can be acquired and maintained

through the use of the mark by a controlled licensee even when the first and only use of the mark was made, and is being made, by the licensee." 3 *McCarthy on Trademarks* § 18.46. Similarly, there is no inherent connection between a trademark and the property such that it is necessarily operationally integrated.

¶ 31 That the tax court's reasoning is not persuasive does not end our inquiry. "We may uphold a judgment on grounds different from those cited by the trial court," *Ness v. W. Sec. Life Ins. Co.*, 174 Ariz. 497, 502, 851 P.2d 122, 127 (App.1992), and the Department urges that we do so. Consequently, we apply the test from *Talley.*

**B.**

¶ 32 As we referenced earlier, a key component of the *Talley* test is the distinction between "basic operations" and "accessory" functions. *Talley* discussed, and Taxpayer points us to, the services provided by Talley in which the parent "reviewed, suggested, or implemented ... market strategies, quality control programs, and customer relations programs for the subsidiaries." 182 Ariz. at 19, 893 P.2d at 19. Taxpayer likens Heritage's role, as the licensor of Taxpayer's trademarks, to that of "quality control programs, and customer relations programs" at issue in *Talley.* However, there is a fundamental distinction between the services at issue in *Talley* and the trademarks at issue here.

¶ 33 As referenced earlier, we noted in *Talley* that the services the parent in that case provided were accessory, and not related to "basic operations," because "[s]uch services are not contained in the product *or its delivery* to the customer." *Id.* at 25, 893 P.2d at 25 (emphasis added); *see id.* ("[F]or the most part, the services are not embodied in the product *or its delivery* to the customers of Talley." (emphasis added)). In the case before us, the facts show quite the opposite. The trademarks appeared on "shipping labels ... invoices, business cards, locations, signage, letterhead, the company

website, as well as miscellaneous promotional items or other items that would be used to identify [Taxpayer]." Because Taxpayer utilized the trademarks on its shipping labels and invoices, the trademarks were a core part of Taxpayer's operations in delivering the commercial printing materials it produced. The trademarks were part of the means by which the Taxpayer identified that it was delivering its product to its consumer. The trademarks were fully and completely operationally integrated with the delivery and distribution of the product itself. Delivery of the product, including the identity of the producer, was not an "accessory" function.

¶ 34 Furthermore, another component of our test in *Talley* is that the services claimed to be accessory not be "so pervasive as to negate function[al] independ[ence]" of the subsidiary. *Id.* at 25, 893 P.2d at 25 (citation omitted). In recent years, many corporations have formed intangibles holding companies ("IHC" or "IHCs"),[2] which are subsidiaries that own trademarks, patents, copyrights, and other intangibles used by the corporation. *See* Tun–Jen Chiang, Comment, *State Income Taxation of Out–of–State Trademark Holding Companies,* 70 U. Chi. L.Rev. 1533, 1533 (2003). The corporation typically assigns trademarks to the IHC, and the IHC licenses the trademarks back to the corporation for a royalty. *Id.* Under this arrangement, the royalty payment reduces the corporation's gross income for state income tax purposes, and the IHC pays little or no state income tax on its gross income from the royalties because it is typically incorporated in a state with no income tax on intangibles or a state with a relatively low income tax rate on intangibles. *See id.* at 1533–35. Heritage was Taxpayer's IHC.

¶ 35 Hellerstein refers to this IHC arrangement as a "transparent effort" to "'game' the system":

One of the standard tax-planning devices corporations employ to reduce taxable income in states where they conduct their operations is to transfer their trademarks or trade names to an intangibles holding

---

2. IHCs are also referred to as trademark holding companies, passive holding companies, intangi-

ble property companies, and passive investment companies.

company (IHC) and license back the trademarks or trade names for a royalty.

. . . .

The obvious and appropriate solution to such transparent efforts to "game" the system is for states to require combined reporting, thereby eliminating the royalty expense as well as the royalty income and thus defeating the tax-avoidance strategy. Hellerstein ¶ 9.20[3][j] (Supp.2009). We decline to base our holding on a taxpayer's use of existing rules to reduce its taxes. As Judge Learned Hand famously said:

> [A] transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one chooses, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose that pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes.

*Helvering v. Gregory,* 69 F.2d 809, 810 (2d Cir.1934). Nevertheless, pursuant to our test in *Talley,* simply because one has established a separate corporation for a permissible purpose (such as an IHC) does not preclude it from being part of the unitary business when it is not only part of the "basic operations" but is also functionally interdependent.

¶ 36 There can be little doubt that Heritage was functionally interdependent. In tax years 1995, 1996, 1997, 1998, and 1999, Heritage received approximately $25 million, $77 million, $81 million, $98 million, and $100 million respectively in royalty revenue from Taxpayer. Revenue flowed back to Taxpayer from Heritage in the form of dividends: $6 million in 1996 and $12 million in 1997 through 1999. During the audit period, Heritage had only one employee, who received compensation of $11,250.00 in 1995, nothing in 1996, and $30,000.00 in 1997, 1998, and 1999. These figures, showing annual royalty revenue to Heritage from Taxpayer of $25 million to $100 million with an annual employee expense on the part of Heritage of zero dollars to $30,000.00, in addition to other factors discussed herein, *supra* ¶¶ 29, 33, and *infra* ¶¶ 41–43, highlight the functional interdependence of Taxpayer and Heritage.

¶ 37 Unlike the facts in *Talley,* here, the interdependence is not "so pervasive as to negate function[al] independ[ence]" of Heritage. *See Talley,* 182 Ariz. at 25, 893 P.2d at 25. The record before us focuses on Heritage's business structure until 1999, but we do not suggest that Heritage could not become independent in the future, or at least not "functionally interdependent" with Taxpayer. During the relevant time period, Heritage was clearly part of Taxpayer's unitary business. It did not market the trademarks to a third party nor was there any evidence of an attempt to do so. Under the *Talley* test, Heritage was a part of Taxpayer's unitary business.

### C.

¶ 38 As we have discussed previously, the Department also adopted regulations after *Talley* which apply and we must consider. Taxpayer asserts that because the trademarks were intangible assets, rather than tangible ones, there was no transfer of materials as required by the regulation. Regulation R15–2D–401(G) states: "A manufacturing, producing, or mercantile type of business is not a unitary business unless there is a substantial transfer of material, products, goods, technological data and processes, or machinery and equipment between the branches, divisions, subsidiaries, or affiliates." A.A.C. R15–2D–401(G).

¶ 39 Though Regulation R15–2D–401 (G) identifies a unitary business by substantial transfer of tangible items, our court and the Arizona Supreme Court have concluded, in similar situations, that intangibles are analogous to tangibles. *Walter E. Heller W., Inc. v. Ariz. Dep't of Revenue,* 161 Ariz. 49, 53, 775 P.2d 1113, 1117 (1989); *M.D.C. Holdings, Inc. v. Ariz. Dep't of Revenue,* 222 Ariz. 462, 469–70, ¶¶ 23–24, 216 P.3d 1208, 1215–16 (App.2009). In *Heller W.,* our supreme court held that a corporation must include out-of-state borrowing of money used to make loans to Arizona consumers in the sales factor ratio. 161 Ariz. at 53, 775 P.2d at 1117. The court stated that the corporation's "costs in procuring the money (which is the 'product'

that it has 'sold' to Arizona customers) are analogous to the costs of a merchandise retailer in procuring his inventory." *Id.* Recognizing that "the context of the transaction must be considered in determining whether a 'sale' actually occurred," *Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue,* 209 Ariz. 71, 76, ¶ 21, 97 P.3d 896, 901 (App.2004), we again analyzed the sales factor ratio as it applies to intangibles in *M.D.C. Holdings. M.D.C. Holdings,* 222 Ariz. at 469–70, ¶¶ 23–24, 216 P.3d at 1215–16. In *M.D.C. Holdings,* we treated the sale of "money to homebuyers in exchange for fees and secured promises to repay (mortgages and associated servicing rights)" as "analogous to the 'sale' of a 'product' within Arizona." *Id.* (quoting *Heller W.,* 161 Ariz. at 53, 775 P.2d at 1117). These cases, coupled with our decision in *Talley* and the purpose of combined reporting, support the conclusion that trademarks may be treated as tangible products under the unitary business standard.

¶ 40 The Department's regulations also include fourteen factors that may be considered in determining whether operational integration exists. Taxpayer asserts that none of the factors apply to Heritage. We disagree. On the facts of this case, the following factors apply:

(1) The same or similar business conducted by components;

(2) Vertical development of a product by components, such as manufacturing, distribution, and sales;

. . . .

(4) Transfer of materials, goods, products, and technological data and processes between components;

. . . .

(14) Sales or leases between components; and

(15) Any other integration between components at the basic operational level.

A.A.C. R15–2D–401(E).

¶ 41 Taxpayer asserts that factor 1 does not apply because Heritage was not in the commercial printing business, which was Taxpayer's basic operation. To the contrary, as we have described above, the only function that Heritage served with regard to trade-

marks was to be an integral part of the delivery of Taxpayer's products and services. We emphasize, as we did earlier, that Heritage may not always be "functionally interdependent" as it was during the tax years relevant here. This is not a case similar to that put forth by one of the amici, Home Depot. Home Depot states that it has an arrangement similar to Taxpayer's with an IHC holding its trademarks. *Brief of Amicus Curiae, Home Depot, U.S.A., Inc. and Affiliates.* However, contrary to the facts here, Home Depot asserts that it has "licensed its trademarks to thirty-seven third parties, with third party [sic] royalty income in one year alone of over $14 million." *Id.* at 14. Home Depot's facts are not before us. Here, there was only one entity that had ever used the marks at issue (Taxpayer), and there is no evidence that Heritage had ever attempted to license the trademarks to another third party. Heritage was operationally integrated in Taxpayer's commercial printing business.

¶ 42 Similarly, Heritage was involved in the vertical development of the product through distribution and sales as described in factor 2. Moreover, factor 4, transfer of materials, applies because, as we discussed previously, intangibles may be considered and qualify as such a transfer here. *Supra* ¶¶ 38–39.

¶ 43 Factor 14 refers to sales or leases between components. Here, there was a non-exclusive licensing agreement. We agree with Taxpayer that it was not an "exclusive sales-purchase agreement" as called for in factor 12. But we decline to construe the term "leases" so technically as to preclude a "license" from having the same effect. And finally, as to factor 15, there was significant other integration between Heritage and Taxpayer based on Heritage being an IHC that did business with no entity other than the parent that formed it. Thus, utilizing the Department's regulations, it is appropriate to consider Heritage as being part of Taxpayer's unitary business.

**D.**

¶ 44 Our conclusion that Heritage was part of Taxpayer's unitary business is also consis-

tent with the approach in Hellerstein, which formed a significant part of our analysis in *Talley*. Hellerstein ¶ 9.20[3][j]. Hellerstein urges that a unitary business should include the flow of "operational intangibles." *Id.* ¶ 8.09[4][a]. Hellerstein explains:

> There has been increasing recognition, at least in some segments of the tax community, that a substantial flow of raw materials, products, or goods between the segments of a manufacturing or mercantile business carried on in more than one state is an essential characteristic of a unitary business whose income is subject to apportionment. A similar point would hold true for segments of a service business or a business whose operations depend on intangibles (e.g., patented processes, technical data, or operational systems software): A finding of unity among segments of the business should depend on a substantial flow of operational services *or a substantial flow of operational intangibles.*

*Id.* (emphasis added). In this case, the intangibles involved (the trademarks) were the operational equivalent of tangibles with Taxpayer and Heritage being functionally interdependent on one another. Taxpayer was Heritage's only customer, and Taxpayer fully depended on Heritage for trademarks to further delivery and sale of its products and services. Taxpayer was unable to show any efforts on the part of Heritage to attempt to license the trademarks to a third person. No entity other than Taxpayer was licensed, or permitted, to utilize the trademarks. There was "a substantial flow of operational intangibles" between the two. *Id.* Heritage was part of Taxpayer's unitary business.

### Conclusion

¶ 45 We affirm the tax court's judgment as to Receivables, Caslon, and Heritage. In the exercise of our discretion, we decline to award fees on appeal. Because Taxpayer prevailed as to two of the three subsidiaries, it is entitled to costs on appeal.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge and MAURICE PORTLEY, Judge.