314 P.3d 576

**HOME DEPOT U.S.A., INC. and Affiliates, Plaintiff/Appellant,**

v.

**ARIZONA DEPARTMENT OF REVENUE, an executive administrative agency of the State of Arizona, Defendant/Appellee.**

No. 1 CA–TX 12–0005.

Court of Appeals of Arizona, Division 1.

Dec. 5, 2013.

Frazer Ryan Goldberg & Arnold, LLP, Phoenix By Michael G. Galloway, Kacie N. Dillon, for Plaintiff/Appellant.

Morrison and Foerster, LLP, Sacramento, CA By Eric J. Coffill, Carley A. Roberts, Pro Hac Vice, for Plaintiff/Appellant.

Arizona Attorney General's Office, Phoenix By Kimberly J. Cygan, for Defendant/Appellee.

Bade Baskin Richards, PLC, Tempe By William A. Richards, for Amicus Curiae Multistate Tax Commission.

Multistate Tax Commission, Washington, D.C. By Shirley K. Sicilian, Bruce J. Fort, Pro Hac Vice, for Amicus Curiae Multistate Tax Commission.

Chief Judge DIANE M. JOHNSEN delivered the opinion of the Court, in which Presiding Judge LAWRENCE F. WINTHROP and Judge MARGARET H. DOWNIE joined.

## OPINION

JOHNSEN, Chief Judge.

¶ 1 Home Depot U.S.A., Inc. challenges the tax court's ruling that it must file a combined return incorporating income its subsidiary, Homer TLC, Inc., generated from licensing Home Depot trademarks. Because the activities of the two corporations are substantially interdependent, we affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

¶ 2 Home Depot is a Delaware corporation headquartered in Atlanta. It operates retail stores selling home improvement products throughout the United States. In 1991, Home Depot created Homer as a wholly owned subsidiary and assigned to it all of Home Depot's trademarks, trade names and service marks, including "The Home Depot," "Do–It–Yourself Warehouse" and "Where Low Prices Are Just the Beginning."

¶ 3 At the time of the assignment, an independent appraisal concluded the market value of the assigned marks was $354 million. Homer entered a 10–year licensing agreement with Home Depot under which, consistent with the appraisal, Home Depot paid a royalty of 1.5 percent of gross sales for use of the marks. Two years before that license agreement was to expire, Homer and Home Depot entered a second 10–year licensing agreement that specified a royalty of four percent of gross sales, based on an appraisal dated October 28, 1999. Pursuant to the license, Home Depot placed the marks on its advertising, website, store facades, shopping carts, tags, signs and employee aprons and on some but not all of the products it sold.

¶ 4 Following an audit of Home Depot's Arizona income, the Arizona Department of Revenue (the "Department") required Home Depot to include Homer in its Arizona return as part of its unitary business for the tax years ending January 30, 2000, January 28, 2001 and February 3, 2002.[1] After timely protesting and exhausting its administrative remedies, Home Depot appealed the Department's assessments to the tax court pursuant to Arizona Revised Statutes ("A.R.S.") section 42–1254(C) (2013).[2]

¶ 5 The tax court ruled in the Department's favor on crossmotions for summary judgment. We have jurisdiction of Home Depot's timely appeal pursuant to Article 6, Section 9 of the Arizona Constitution and A.R.S. § 12–2101(A) (2013).

## DISCUSSION

### A. Legal Principles.

¶ 6 A corporation that does business in Arizona and has income that "is the result of activity within [Arizona] or derived from sources within" Arizona must file an Arizona income tax return, A.R.S. § 43–102(A)(5) (2013), and must pay tax on its "entire Arizona taxable income," A.R.S. § 43–1111 (2013).

¶ 7 When a group of affiliated corporations does business in multiple states and one of them has income from Arizona, we apply the "unitary-business principle" to determine whether a member of the group "has the requisite minimal state connection to include its income in the tax base." *R.R. Donnelley & Sons Co. v. Ariz. Dep't of Revenue*, 224 Ariz. 254, 257, ¶ 11, 229 P.3d 266, 269 (App.2010) (citations omitted). If the affiliated corporations qualify for unitary treatment, Arizona may require them to file a combined return. Ariz. Admin. Code ("A.A.C.") R15–2D–401(B); *see also* A.R.S. § 43–942(B) (2013). The taxpayer's consolidated income then is apportioned in accordance with Arizona's Uniform Division of Income for Tax Purposes Act, A.R.S. §§ 43–1131 to –1150 (2013).

¶ 8 In *State ex rel. Arizona Department of Revenue v. Talley Industries, Inc.*, 182 Ariz. 17, 23, 893 P.2d 17, 23 (App.1994), this court adopted an "intermediate approach" to determining whether to apply unitary treatment to a company and its affiliate(s). Under this approach, unitary treatment is appropriate when there is "substantial interdependence of basic operations among the various affiliates or branches of the business." *Id.* at 24, 893 P.2d at 24 (quoting 1 Jerome R. Hellerstein & Walter Hellerstein, State Taxation ("Hellerstein") ¶ 8.11[5], at 8–92).

¶ 9 In *Talley*, we examined 25 subsidiaries that, *inter alia*, manufactured distinct lines

---

1. According to the Department, Homer's reported income over the tax years in question totaled about $4.7 billion. Over the same time period, Home Depot reported total income of about $3.8 billion. During the years at issue, Homer had only four employees: A lawyer, a paralegal and two administrative assistants.

2. Absent material revision after the relevant date, we cite a statute's current version.

of products, imported apparel and bought and sold real property. 182 Ariz. at 18–19, 893 P.2d at 18–19. The taxpayer-parent sought unitary treatment, arguing it controlled the operations of the subsidiaries. *Id.* at 19, 893 P.2d at 19. The parent created accounting, operating and personnel policies for the subsidiaries and provided company-wide training, benefit and pension plans and information services. *Id.*

¶ 10 In adopting the Hellerstein approach, we quoted a discussion by the Pennsylvania supreme court in *Pennsylvania v. ACF Industries, Inc.,* 271 A.2d 273 (1970), which examined whether the business activities at issue there were part of a "single enterprise" or were instead "a truly divisionalized business." 182 Ariz. at 24, 893 P.2d at 24. Consistent with that analysis, we held the taxpayer and its subsidiaries in *Talley* could not file a combined return because there was "no substantial interrelationship or interdependence of basic operations" between the parent and its affiliates. *Id.* at 18, 893 P.2d at 18. We explained:

> There were no transfers of materials, products, goods, technological data relating to products, processes, machinery, or equipment by subsidiaries operating wholly outside Arizona to subsidiaries with operations in Arizona. Also, virtually no flow of product and no vertical or horizontal integration of business operations exists between the subsidiaries with, and those without, income-producing factors and business operations in Arizona. No basic operational ties existed between the two Arizona real estate subsidiaries and any other Talley subsidiary.

*Id.* at 19, 893 P.2d at 19.

¶ 11 In *Donnelley,* we applied the *Talley* standard to a subsidiary that, like Homer, licensed the parent company's trademarks to the parent, and held unitary treatment was required. 224 Ariz. at 261–65, ¶¶ 29–45, 229 P.3d at 273–77. We observed that the trademarks, which were found on the parent company's shipping labels, letterhead, signs and website, "were a core part" of the parent's operations. *Id.* at 262, ¶ 33, 229 P.3d at 274. We concluded that because the parent paid the subsidiary royalties of between $25 million and $100 million a year and the subsidiary did not license the trademarks to any third party, the trademarks were part of the parent's "basic operations" and the subsidiary's licensing business was "functionally interdependent" with the parent's. *Id.* at 263, ¶¶ 35–36, 229 P.3d at 275.

## B. Home Depot and Homer Require Unitary Treatment.

¶ 12 Home Depot filed an *amicus curie* brief in the *Donnelley* appeal, prompting us to comment in that decision that the subsidiary's operations in that case were dissimilar to Home Depot's description of Homer's business. *Id.* at 264, ¶ 41, 229 P.3d at 276. Directly presented for the first time with the facts of the relationship between Home Depot and Homer, however, we reach the same result as in *Donnelley:* Unitary treatment is required because the operations of Home Depot and Homer are substantially interrelated.[3]

¶ 13 There is no dispute that Home Depot and Homer are separate organizations: The two companies do not share headquarters, books and records, software systems, bank accounts, purchasing, employees, officers or directors. Moreover, while Home Depot sells home improvement products, Homer does not; its sole business is the management of the Home Depot trademarks. Homer actively manages those marks; according to the record, it has sent hundreds of cease-and-desist letters and commenced more than 50 lawsuits aimed at protecting the marks. And of course, having assigned its trademarks to Homer, Home Depot is not in the business of licensing those trademarks to third parties.

¶ 14 But Home Depot would not be "Home Depot" without the trademarks that it licenses from Homer for its retail stores, advertising and website. Home Depot argues it sells

---

**3.** We review the tax court's grant of summary judgment *de novo. Wilderness World, Inc. v. Ariz. Dep't of Revenue,* 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995). The same standard applies to our review of the tax court's interpretation of statutes. *Ariz. Dep't of Revenue v. Ormond Builders, Inc.,* 216 Ariz. 379, 383, ¶ 15, 166 P.3d 934, 938 (App.2007).

1,000 different brands of products, most of which do not bear its own trademark. That argument overlooks the obvious—it is the "Home Depot" brand on the company's advertisements and website and throughout its retail stores that Home Depot relies on to distinguish the quality of its products, selection and customer service from those of its competitors. As one of the appraisals the company obtained of the licensed marks concluded, "Together these trademarks identify Home Depot's operations[,] products, and services. These trademarks are a signal to the consumer of the level of quality and service that is associated with Home Depot."

¶ 15 By the same token, without Home Depot's continuing efforts to promote its brand, the trademarks that constitute Homer's only assets would be worthless. One of the appraisals supports this conclusion, noting that the appropriate royalty rate was based in part on Home Depot's financial performance and on the company's expenditure of "significant advertising dollars to establish and maintain [its] name recognition." That appraisal noted Home Depot's strong market share and "significant commitment to maintaining the status and reputation of the [marks] in the marketplace."

¶ 16 More fundamentally, the marks at issue have value to Homer only to the extent that customers value the Home Depot brand. As one of the appraisals noted, quoting a treatise: "Descriptions of a trademark begin to sound very much the same as descriptions of goodwill." The appraisal likewise proclaimed, "The Brands are well recognized among the target market consumers. The Company's philosophy is to provide value to its customers through a combination of quality, price, and service, thus creating consumer loyalty and differentiating the Company from its competitors." *See Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 854 n. 14, 102

S.Ct. 2182, 72 L.Ed.2d 606 (1982) (trademark represents the owner's "goodwill, which he spent energy, time, and money to obtain"); *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir.1984) (trademarks and trade names embody goodwill of ongoing business); *Visa U.S.A., Inc. v. Birmingham Trust Natl. Bank*, 696 F.2d 1371, 1375 (Fed.Cir.1982) (trademarks are "integral and inseparable elements of the goodwill of the business or services to which they pertain").

¶ 17 Although Home Depot argues that Homer is in the distinct business of licensing trademarks, the only trademarks it licenses are those it acquired from Home Depot.[4] And, as one of the company's appraisals stated, "[T]he most important [of the trademarks] are those which are pervasive to the overall Company operations."[5] The circumstances make clear that there are substantial "basic operational ties" between the two companies. Indeed, one of the appraisals on which Home Depot relies states that the "trademarks, being so closely identified with overall operations of [Home Depot], are assumed to have a life as long as [Home Depot] itself."

¶ 18 During the tax years at issue, Homer earned between $789 million and $2 billion a year; all but three percent of those revenues came from domestic Home Depot affiliates.[6] Moreover, Home Depot's license grants the parent company the exclusive right to use the marks in the home improvement business; Homer's other revenues are derived from its licensing of the Home Depot marks for toys, publications and NASCAR souvenirs.

¶ 19 We disagree with Home Depot's assertion that Homer's licenses are an "accessory" to Home Depot's business of the sort that, under *Talley*, may not require or allow unitary treatment. *Talley* held that "acces-

4. The *amicus curiae* contends that Home Depot assigned the rights to Homer in a tax-free exchange "with no reported consideration." The assignment agreement recites that it was made "for good and valuable consideration" but does not specify the consideration. The Department, however, does not argue that what Homer paid for the trademarks bears on whether the two businesses require unitary treatment.

5. The appraisal listed these "most important" marks as "variations of 'The Home Depot' and 'Homer,' the do-it-yourself guy, as well as various slogans such as 'Where Low Prices Are Just The Beginning.'"

6. Licensing to Home Depot foreign affiliates accounted for about two percent of Homer's revenues.

sory services" are those "not contained in the product or its delivery to the customer." 182 Ariz. at 25, 893 P.2d at 25 (addressing services such as accounting, purchasing and training). In *Donnelley,* we held the trademark the parent company licensed from the subsidiary was not an accessory service. Because the mark appeared on the parent's shipping labels, invoices and stationery, we concluded it was "fully and completely operationally integrated with the delivery and distribution of the product itself." 224 Ariz. at 262, ¶ 33, 229 P.3d at 274.

¶ 20 The same is true here. The trademarks that Home Depot licenses from Homer are an integral component of Home Depot's delivery of products to its customers. It does not matter that, as Home Depot argues, most of the products it sells bear trademarks of other manufacturers. Home Depot's advertisements and website use the "Home Depot" trademark to invite customers looking for home improvement products to visit its stores, and once the customers arrive, they are greeted by "Home Depot" signage on the façade of the store and on shopping carts, employee badges and shopping bags. Under these circumstances, the company's argument that it "most certainly can 'advertise and promote the products it sells' without relying upon" its own trademarks does not withstand scrutiny.

■ ¶ 21 Home Depot, nevertheless, argues its transactions with Homer have been at arm's length, and points out that the Department has not challenged the appraisal establishing the legitimacy of the royalty it pays Homer. We cannot accept the argument that unitary treatment is not appropriate under *Talley* whenever an affiliate's contribution to income can be fairly approximated. Although *Talley* noted that the inability to accurately account for an affiliate's income was a "consideration[ ] that gave rise to the unitary business doctrine in the first place," 182 Ariz. at 25, 893 P.2d at 25, *Talley* does not hold that unitary treatment is appropriate only when the taxpayer is unable to fairly calculate the value of the subsidiary's activities. Instead, we read *Talley* to establish the principle that unitary treatment will be imposed or allowed when-

ever the activities of the affiliated organizations affect the other(s) in ways that are "so pervasive as to negate any claim that they function independently from each other." 182 Ariz. at 24, 893 P.2d at 24 (quoting *ACF Indus., Inc.,* 271 A.2d at 279–80).

■ ¶ 22 In such a case, when the activities of the various organizations are part of a "single enterprise," unitary treatment is required. *Id.* For this analysis, business organizations are part of a "single enterprise" when there is a "substantial interdependence of basic operations" among the affiliates. *Id.* (quoting Hellerstein, ¶ 8.11[5], at 8–92). In adopting the Hellerstein approach, we quoted with approval the treatise's observation that the "substantial interdependence" analysis "provide[d] a quantifiable, objective test of the unitary business." *Id.* Home Depot's argument that substantially interdependent businesses may escape unitary treatment if they can prove they deal with each other at arm's length flies in the face of our desire in *Talley* to adopt a "quantifiable, objective" test for unitary treatment. *See* Hellerstein ¶ 8.11[3][c][i], at 8–202 (3d ed.2000) (when there is substantial interdependence, "combination follows as a matter of course, whether or not a taxpayer is able to demonstrate that the affiliates dealt with each other through arm's-length pricing arrangements").

¶ 23 Finally, application of the relevant Department regulation, A.A.C. R15–2D–401(E), supports unitary treatment here. The regulation lists the following factors relevant to determining whether a taxpayer has sufficient operational integration for unitary treatment:

1. The same or similar businesses conducted by components;

2. Vertical development of a product by components, such as manufacturing, distribution, and sales;

3. Horizontal development of a product by components, such as sales, service, repair, and financing;

4. Transfer of materials, goods, products, and technological data and processes between components;

5. Sharing of assets by components;

6. Sharing or exchanging of operational employees by components;

7. Centralized training of operational employees;

8. Centralized mass purchasing of inventory, materials, equipment, and technology;

9. Centralized development and distribution of technology relating to the day-to-day operations of the components;

10. Use of common trademark or logo at the basic operational level;

11. Centralized advertising with impact at the basic operational level;

12. Exclusive sales-purchase agreements between components;

13. Price differentials between components as compared to unrelated businesses;

14. Sales or leases between components; and

15. Any other integration between components at the basic operational level.

A.A.C. R15–2D–401(E). Not every listed factor must be present in every unitary business. A.A.C. R15–2D–401(F); *Donnelley*, 224 Ariz. at 259, ¶ 18, 229 P.3d at 271.

¶ 24 The transfer of the trademarks between Home Depot and Homer implicates factors 4 (transfer of materials, goods and products) and 5 (sharing of assets). *See Donnelley*, 224 Ariz. at 264, ¶ 39, 229 P.3d at 276 ("trademarks may be treated as tangible products under the unitary business standard"). Also implicated is factor 14 (sales or leases between components). *Id.* at ¶ 43 ("leases" may include "license"). Further, as we have held, the trademarks Home Depot licensed from Homer were an "integral part of" the former's delivery of goods to its customers (factor 1), *see id.* at ¶ 41, and Homer was involved in the trademarks' vertical development through distribution and sales (factor 2). *Id.* at ¶ 42. Finally, factor 15 applies because Homer conducted 97 percent of its business with Home Depot. *Id.* at ¶ 43. Accordingly, as in *Donnelley*, the factors stated in the regulation weigh in favor of unitary treatment. *See id.* at ¶¶ 39–43.

## CONCLUSION

¶ 25 For the reasons stated above, because Home Depot and Homer are part of a unitary business, the Department correctly required inclusion of Homer on Home Depot's combined Arizona return. We therefore affirm the tax court's grant of summary judgment to the Department and deny Home Depot's request for attorney's fees and costs on appeal pursuant to A.R.S. §§ 12–348(B) (2013) and 12–341 (2013).